

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed May 13, 2019



**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Victory Medical Center Mid-Cities, LP et al., | § | Case No. 15-42373-mxm-11 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

| | | |
|---|---|---|
| | § | |
| Neil Gilmour, Trustee for the Grantor Trusts of Victory Parent Company, LLC et al., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 17-4000-mxm |
| | § | |
| Connecticut General Life Insurance Company and Cigna Corporation, | § | |
| | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER REGARDING (A) COMPETING MOTIONS FOR SUMMARY JUDGMENT AND (B) RELATED EVIDENTIARY ISSUES
*Relates to Adv. ECF Nos. 116, 120, 128, 134, 136*

On April 24, 2019, the Court held a hearing on the competing motions for summary judgment filed by the Plaintiff and the Defendants. One of the hotly contested issues in this fraudulent-transfer suit is whether the Chapter 11 Debtors received reasonably equivalent value in connection with a prepetition settlement agreement they signed with the Defendants. Each party has moved for full or partial summary judgment on this issue. The summary-judgment record establishes that there are no material contested subsidiary facts on this issue and that the Debtors received reasonably equivalent value in the exchange. Therefore, the Court grants the Defendants' motion for summary judgment regarding reasonably equivalent value and denies the Plaintiff's motion for partial summary judgment.

## I.      JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(H) and (O). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## II.      FACTS[1]

### A.  Historical relationship between the parties

Connecticut General Life Insurance Company and Cigna Corporation (together, "*Cigna*") administers or insures health benefit plans.[2] The Debtors (together, "*Victory*") operated medical centers throughout Texas for several years.[3] Victory alleges it treated hundreds of patients who

---

[1] Not all of the facts included here are material, but they are included for background.

[2] *See* Pl.'s 1st Am. Compl. ¶ 16, Adv. ECF No. 33. When an employer offers health benefits to its employees, it can elect to fund the plan itself or to purchase an insurance policy to fund the plan. The plan is "administrative services only" or "ASO" when the employer funds the plan and simply contracts with Cigna to administer the plan, rather than insure the plan. *E.g., N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 187 (5th Cir. 2015).

[3] See Pl.'s 1st Am. Compl. ¶ 15.

were insured or covered by health benefit plans insured or administered by Cigna.[4] At all relevant times, Victory was "out-of-network" with Cigna, which means there was no agreement between Cigna and Victory regarding the procedures that would be covered under the Cigna administered or insured plans, or the amount Victory would receive on such claims submitted to Cigna.[5] For this reason, Victory knew and expected it would only be paid a percentage of the amounts it was billing to Cigna.[6]

## B. The 2013 Lawsuit

Victory contends Cigna refused payment on approximately $22.5 million of healthcare service claims submitted by Victory—claims that Victory now values at $9,840,145.[7] Victory had been submitting claims for reimbursement to Cigna for a period of time. In 2013, however, Cigna investigated Victory's business practices and concluded that the claims for reimbursement Victory submitted to Cigna were not, in fact, eligible for reimbursement under the plans Cigna administered or insured.

More specifically, the majority of the plan documents for the health benefit plans Cigna administers or insures exclude "charges for services that would not have been made in the absence of the plan or for which the patient is not legally obligated to pay."[8] Linda Halik, an investigator in Cigna's Special Investigations Unit ("*SIU*"), was directed to investigate, among other things, whether the claims Victory submitted to Cigna fell within the scope of that exclusion. As a part of

---

[4] *Id.*

[5] *Id.* ¶¶ 16, 21.

[6] Defs.' App. 203:7-25; Defs.' App. 166:2-5. The Defendants' Appendix is filed at Adv. ECF No. 122.

[7] Pl.'s 1st Am. Compl. ¶¶ 13-14; Defs.' App. 1-2. *See also* Supplemental Expert Report of Cynthia Seale, Adv. ECF No. 117-1, at 37 of 60 (valuing Victory's pre-release claims at $10,994,843, less patient responsibility of $1,154,698, for a total of $9,840,145).

[8] Defs.' App. 185:5-24.

her investigation, Ms. Halik requested information concerning Victory's business practices and select patient ledgers.[9]  She then sent verification of service (or survey) letters to Victory patients.[10]  Her investigation took months.[11]  Cigna sent more than a hundred verification of service letters to Victory patients within a two-year period.[12]  Ms. Halik received approximately fifty-five returned verification of service letters, and according to Cigna, in the majority of those responses, the patients stated that Victory did not bill for its services and/or told the patients that they were not responsible for any charges.[13]  Ms. Halik's investigation, according to Cigna, "showed overwhelming proof" that Victory was not collecting anything from its patients.[14]

According to the Plaintiff, in contrast, Cigna's decision to investigate for fee forgiving was based entirely on how much Cigna had paid, and Cigna used unreliable and vague survey questions and responses as a pretext to push Victory to go in-network with Cigna.[15]  Suffice it to say, the issue of whether Victory was engaged in fee forgiving has been contested at all relevant times, including now and when Victory and Cigna settled the issue prior to the bankruptcy filing.

According to Cigna, based on the investigation, Ms. Halik concluded that Victory was, in fact, engaged in fee forgiving.[16]  Ms. Halik conveyed the results of her investigation to her supervisor, who in turn elevated the matter to Cigna's in-house counsel, William Welch II, who ultimately agreed that evidence showed that Victory was engaged in fee forgiving.[17]  As a result,

---

[9] Defs.' App. 182:18-25.

[10] Defs.' App. 182:24-25-App. 183:6; *see also* Defs.' App. 219; Defs' App. 4-25.

[11] Defs.' App. 183:23-App. 184:3.

[12] Defs.' App. 188:2-App. 189:2; *see also* Defs.' App. 219, App. 4-25.

[13] Defs.' App. 219-220; Defs.' App. 4-25.

[14] Defs.' App. 190:5-7.

[15] *See generally* Pl.'s 1st Am. Compl. ¶¶ 22-40.

[16] Defs.' App. 186:23-App. 187:5; Defs.' App. 171:14-17.

[17] Defs.' App. 172:1-App. 173:7.

Cigna placed Victory in the "fee forgiveness protocol" in 2013. The "fee forgiveness protocol" or "flag" stopped claims submitted by Victory from being paid automatically by Cigna, and generated a warning in the claims-processing system to alert the claims processor to look further into such claims.[18] The flag communicated to the claims processor that the SIU recommended that such claims be denied.[19] The claims processor would then look for certain circumstances that would supersede SIU's recommendation, such as if the member had already met his or her cost share, the particular claim was not medically necessary, or the patient's plan did not have out-of-network benefits.[20] The claims processer would also have the discretion to override SIU's recommendation.[21] Ultimately, once the flag was placed, virtually all claims Victory submitted to Cigna were denied (unless the recommendation was overridden), and Victory was sent an explanation of benefits explaining this result.[22]

After Cigna began denying the claims submitted by Victory, on June 6, 2013, Victory Medical Center Mid-Cities, L.P. and Victory Medical Center Plano, L.P., among other plaintiffs, filed a lawsuit against Cigna in federal district court (the "*2013 Lawsuit*").[23] Victory sought recovery against Cigna for unpaid claims under ERISA, among other claims.[24] Victory alleged that Cigna had denied claims worth approximately $22 million and sought to recover that amount from Cigna.

---

[18] Defs.' App. 174:8-13.

[19] Defs.' App. 174:25-App. 175:1.

[20] Defs.' App. 176:2-22; Defs.' App. 177:4-10; Defs.' App. 180:22-App. 181:16.

[21] Defs.' App. 177:4-10.

[22] Defs.' App. 178:8-App. 179:9.

[23] *See Victory Medical Center Plano, L.P. et al. v. Cigna*, No. 4:13-cv-1654 (S.D. Tex.).

[24] See generally 2d Am. Compl. in the 2013 Lawsuit, No. 4:13-cv-1654 (S.D. Tex.), ECF No. 25.

Cigna filed a counterclaim seeking a declaration that (i) Victory is not entitled to payments on claims where the member is not being required to pay his or her portion of the charges (*i.e.*, fee-forgiving); (ii) Victory is not entitled to payment for charges that exceed the plans' provisions for payment of charges for out-of-network services; and (iii) Cigna is entitled to recoup all overpayments made to Victory prior to the flag being placed.[25]

On February 28, 2014, the parties stipulated to dismissal without prejudice of their claims to facilitate settlement negotiations.[26] The federal district court entered an order of dismissal without prejudice on March 3, 2014.[27]

## C. The in-network agreements

Victory desired to be in-network with Cigna and other payors from day one.[28] Victory projected that going in-network would drive significant patient volume growth, which, in turn, would grow its revenues and profits.[29] Victory, in fact, engaged a third-party consultant, Eveia Healthcare, to negotiate in-network agreements on Victory's behalf.[30] Victory hoped to have in-network agreements with Cigna by February 2015.[31] According to Victory's CEO, Roberts Helms, who has decades of experience operating healthcare facilities, in addition to growing revenues, an added benefit of being in-network is that the provider will know exactly what is going to be reimbursed on a case-by-case basis.[32]

---

[25] See generally Answer in the 2013 Lawsuit, No. 4:13-cv-1654 (S.D. Tex.), ECF No. 28.

[26] See Stipulation in the 2013 Lawsuit, No. 4:13-cv-1654 (S.D. Tex.), ECF No. 31; Defs.' App. 212:10-App. 213:14.

[27] See Order in the 2013 Lawsuit, No. 4:13-cv-1654 (S.D. Tex.), ECF No. 33.

[28] Defs.' App. 196:16-22.

[29] Defs.' App. 204:7-20; Defs.' App. 208:16-25.

[30] Defs.' App. 205:15-App. 206:18.

[31] *Id.*

[32] Defs.' App. 207:1-9; Defs.' App. 167:17-21 (noting that in-network agreements have value because they generate increased volume). As noted below, however, the parties' entry into the in-network agreements in February 2015—

Mr. Helms signed the in-network agreements on February 24, 2015.[33]  On February 27, 2015, Mr. Helms sent an email announcing the in-network agreements and touting their benefits.[34] He further noted that Victory was negotiating a repricing agreement with Cigna for unpaid claims, "which will bring additional positive cash flow" for Victory.[35]  On March 19, 2015, Mr. Helms sent another email noting that "[w]e are finalizing the terms of a settlement agreement for the DFW market on over 300 claims that represents substantial dollars where Victory received zero payment."[36]  The in-network agreements were effective on April 1, 2015.[37]

**D.  The Settlement Agreement**

On March 27, 2015, Victory and Cigna entered the Settlement Agreement, which resolved the disputed claims (the "***Exhibit A Claims***").[38]  Under the Settlement Agreement, Cigna agreed to reprocess the Exhibit A Claims under the rates in the newly negotiated in-network agreements, and to use reasonable business efforts to process and pay such claims within ninety days of the Settlement Agreement's March 27, 2015 effective date.[39]  Of those 317 disputed claims, forty-four were submitted pursuant to fully insured plans, and 273 were submitted pursuant to self-funded plans.[40]

---

by itself—could not have been part of the reasonably-equivalent-value exchange when the settlement agreement was signed on March 27, 2015.

[33] Defs.' App. 26, 43.

[34] Defs.' App. 65-66.

[35] Defs.' App. 65.

[36] Defs.' App. 67.

[37] Defs.' App. 211:6-9.

[38] *See generally* Defs.' App. 69-83.  The 317 claims were listed in an Exhibit to the Settlement Agreement.  Defs.' App. 69 (describing "Exhibit A Claims"), Defs.' App. 77-83.  Under the Settlement Agreement, Victory also agreed to submit, and Cigna agreed to process, claims for Cigna customers with dates of service from March 1, 2015 through March 31, 2015 (the "***Supplemental Claims***") at the newly negotiated in-network rates.

[39] *See* Defs.' App. 70-73; Defs.' App. 191:15-24.

[40] The parties dispute the standard of review a court should use when reviewing whether Cigna properly denied the 44 claims submitted under fully insured plans, either *de novo* (the Plaintiff's contention) or abuse of discretion (Cigna's

As a part of the Settlement Agreement, the parties also released all claims they had against each other related to or arising out of the claims that were subject to the Settlement Agreement, including Victory's claims for underpayments and Cigna's claim for overpayments for any Exhibit A Claims that were paid in full prior to the effective date of the Settlement Agreement.[41]

While Victory alleges that the billed charges submitted to Cigna were on the order of $22 million, Victory understood that the amount Victory would actually receive as payment on those claims was significantly less.  On May 28, 2015, Kelly Russell, Victory's Director of Revenue Recovery, sent an email to other Victory executives, including Mr. Helms, outlining the Settlement Agreement.  Ms. Russell noted that "Cigna will pay the claims based on the newly negotiated in-network payment rates and per the terms and conditions of the benefit plan and Cigna's standard claims payment policies and procedures."[42]  She further noted that "Cigna will not be responsible for claims applied against client bank accounts closed or insufficiently funded because the client has terminated their business with Cigna or is no longer funding their claim bank account."[43]  Ms. Russell concluded that "Cigna will use reasonable efforts to process and pay the claims within 90 days of the effective date of the agreement," which was March 27, 2015.[44]

---

contention).  The Court need not decide that issue; it is enough to note that the parties resolved any such hotly contested issues when they settled prior to bankruptcy.

[41] *See* Defs.' App. 71-74; Defs.' App. 192:2-17.

[42] Defs.' App. 84.

[43] *Id.*  As explained by Ms. Halik, the client funded the settlement payment for ASO plans.  Defs.' App. 193:11-16; Defs.' App. 193:22-App. 194:9.  Thus, if the ASO client had closed its account or its account had insufficient funds, no payment would issue.

[44] Defs.' App. 84.

Ms. Russell then completed a "down and dirty calculation" of the "maximum settlement amount," which for Victory[45] was $4,143,100.00.[46] She noted that "it is likely the number will be reduced" due to the closed banking carve-out.[47] She also noted that her calculation did not take into account patient responsibility.[48]

Mr. Helms, the CEO of all Victory entities, when expecting the payments under the Settlement Agreement, responded, "Send the signed documents."[49] On the same email exchange, Michael Urbach, President and Chief Operating Officer for Victory, stated, "I think we have no choice but to sign and get some cash flowing. We can argue other details later. Time is of the essence."[50]

Victory had counsel throughout this process.[51] As stated above, Victory also retained the healthcare consulting firm Eveia to help negotiate the in-network agreements. Moreover, Mr. Helms, who executed the Settlement Agreement, had forty years of experience in the healthcare industry, including as the CEO of several hospitals and founder of Triumph Healthcare.[52] Victory's counsel reviewed the Settlement Agreement before it was signed.[53]

---

[45] Ms. Russell's email also addresses a separate Settlement Agreement with Victory affiliates in Houston and Beaumont. The plaintiffs in this suit, Victory, are referred to as "North."

[46] Defs.' App. 84.

[47] *Id.*

[48] *Id.*

[49] Defs.' App. 86.

[50] *Id.*

[51] Defs.' App. 209:10-App. 210:18.

[52] Defs.' App. 210:21-24; Defs.' App. 197:10-App. 202:12.

[53] Defs.' App. 216:15-18.

Ultimately, Victory received around $3.3 million under the Settlement Agreement and some of that was received after its bankruptcy case was filed.[54]  No amount has been returned to Cigna.[55]  The $3.3 million was positive on Victory's cash flows.[56]

## E.  The bankruptcy

Victory considered filing bankruptcy in late April or early May 2015.[57]  Victory ultimately filed for Chapter 11 bankruptcy relief on June 12, 2015.[58]  Victory filed bankruptcy because it was not able to service its debts, including approximately $15 million in long-term debt.[59]

Victory's First Amended Joint Plan of Reorganization (the "***Plan***") was confirmed on March 28, 2016.[60]  Pursuant to the terms of the Plan, grantor trusts were created to which various assets of the Debtors were transferred, including certain "Reserved Litigation Claims."[61]  Neil Gilmour was appointed Trustee for each of the grantor trusts.[62]  In addition to having control over the Reserved Litigation Claims, the Trustee was also expressly granted the right to pursue "Avoidance Actions."[63]

## F.  The adversary proceeding

On January 1, 2017, the Plaintiff filed this adversary proceeding against Cigna, seeking to recover payments for medical services that Victory allegedly provided to the beneficiaries of

---

[54] Defs.' App. 214:3-14, 18-22; Defs.' App. 168:12-17.

[55] Defs.' App. 214:25-App. 215:7.

[56] Defs.' App. 169:16-22.

[57] Defs.' App. 218:14-18.

[58] 1st Am. Compl. ¶¶ 6-9.

[59] Defs.' App. 164:17-App. 165:5.

[60] Bankr. ECF No. 969 (confirmation order, with First Amended Joint Chapter 11 Plan attached as Exhibit A).

[61] *Id.* at 139 of 168.

[62] *Id.*

[63] *Id.* at 150.

employee benefit plans administered or insured by Cigna.[64]  In its Original Complaint, the Plaintiff

asserted the following claims:  (i) fraudulent transfer under the Bankruptcy Code and the Texas

Uniform Fraudulent Transfer Act ("***TUFTA***"); (ii) economic duress; (iii) state-law breach of

fiduciary duty; and (iv) unjust enrichment.[65]

Cigna moved to dismiss the Plaintiff's state-law claims for breach of fiduciary duty and

unjust enrichment (and the accompanying request for exemplary damages), arguing that these state

law claims were preempted by ERISA in that the Plaintiff really sought unpaid benefits under

healthcare benefit plans subject to ERISA.[66]

The Court granted in part and denied in part the motion to dismiss the Original Complaint.[67]

Thereafter, the Plaintiff filed his first Amended Complaint[68] in which he asserted the following

claims:  (1) fraudulent transfer under the Bankruptcy Code and TUFTA; (2) economic duress; and

(3) breach of fiduciary duty under ERISA § 502(a)(3).

Cigna then moved to dismiss Plaintiff's claim for breach of fiduciary duty under ERISA §

502(a)(3), arguing that the Plaintiff cannot seek relief under § 502(a)(3) when the relief the Plaintiff

seeks is really a claim for benefits under § 502(a)(1)(B).[69]  Cigna also moved to dismiss the

Plaintiff's claim for exemplary damages.[70]  After a hearing, the Court granted Cigna's motion to

dismiss, dismissing with prejudice the Plaintiff's claim under ERISA and claim for exemplary

---

[64] *See generally* Orig. Compl., Adv. ECF No. 1.

[65] *See generally id.*

[66] *See generally* Mot. Dismiss, Adv. ECF Nos. 17, 18.

[67] *See Order Granting in Part and Denying in Part Motion to Dismiss*, Adv. ECF No. 49.

[68] Adv. ECF No. 33.

[69] *See generally* Mot. Dismiss, Adv. ECF No. 37.

[70] *See generally id.*

damages and denying leave to amend.[71]   In dismissing the Plaintiff's ERISA § 502(a)(3) claim with prejudice and denying leave to amend, the Court noted the 2013 Lawsuit, the Settlement Agreement, and the previous opportunity afforded the Plaintiff to assert a claim for benefits under ERISA § 502(a)(1)(B).[72]

Thereafter, on February 9, 2018, the Plaintiff dismissed his claim for economic duress, leaving only the Plaintiff's claims for constructive fraudulent transfers under 11 U.S.C. §§ 544, 548, 550, and Texas Business & Commerce Code § 24.005(a)(2), and his related request for attorney's fees.[73]   In his remaining claims, the Plaintiff seeks to avoid the Settlement Agreement as a constructive fraudulent transfer and to recover a monetary judgment under 11 U.S.C. § 550(a).

## G.  The summary-judgment motions

The parties have now filed competing motions for summary judgment.   The Plaintiff contends in his motion ("***Plaintiff's Summary-Judgment Motion***")[74] and related briefs[75] that the undisputed material facts show that—

- the Plaintiff has standing to pursue the claims asserted in this adversary proceeding;

- the transfers made in the Settlement Agreement occurred within two years of the petition date;

- Victory was insolvent when it entered into the Settlement Agreement; and

- with respect to the forty-four claims submitted under fully insured plans, (i) Cigna improperly denied the claims; (ii) such claims had a pre-release value of $1,639,211.19 in

---

[71] *See Order Granting Motion to Dismiss*, Adv. ECF No. 57.

[72] *See* Defs.' App. 136-37.

[73] *See Stipulation of Dismissal of Cigna's Counterclaims and Plaintiffs' Counts 2, 3, 4 and 6*, Adv. ECF No. 88.

[74] Adv. ECF No. 116.

[75] Adv. ECF Nos. 117, 137.

the aggregate; (iii) Cigna's post-release payments on such claims were $658,997.32 in the aggregate; and (iv) the post-release payment on any such claim was not reasonably equivalent to its pre-release value.

Based on these alleged undisputed material facts, the Plaintiff argues that he is entitled to judgment as a matter of law on his causes of action for fraudulent transfer in an amount of at least $980,213.87.[76]

Cigna, conversely, contends in its summary-judgment motion (*"**Cigna's Summary-Judgment Motion**"*)[77] and related brief[78] that as a matter of law, (i) Victory received reasonably equivalent value in consideration for the Settlement Agreement; (ii) the Plaintiff's request for a monetary judgment on Victory's unliquidated, un-litigated causes of action violates Cigna's due process rights, circumvents the strict confines and broad preemptive effect of ERISA, and runs afoul of the purpose of 11 U.S.C. § 550(a) and Texas Business and Commerce Code § 24.008(a); and (iii) Cigna is entitled to summary judgment on its estoppel affirmative defense because Victory accepted payments under the Settlement Agreement after filing bankruptcy, failed to return any of those payments to Cigna, and Cigna is entirely without its benefit of the bargain—the resolution of the disputed claims.

---

[76] The Plaintiff's Summary-Judgment Motion asks for $972,976.00, which the Court understands to be a mathematical error.

[77] Adv. ECF No. 120.

[78] Adv. ECF No. 121.

### III.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.[79]   Summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.[80]   The moving party bears the burden of establishing that there are no genuine issues of material fact.[81]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.[82]   The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.[83]   The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial.[84]

The Court's ruling in this matter hinges on whether Victory received reasonably equivalent value in connection with the Settlement Agreement.  This Court's determination is a fact issue that is reviewed on appeal for clear error.[85]   As explained below, however, the material subsidiary facts that lead to this Court's ultimate factual finding on reasonably equivalent value are not in dispute.

---

[79] FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.

[80] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[81] *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *In re Dunham*, 110 F.3d 286, 288–89 (5th Cir. 1997).

# IV. ANALYSIS

The Plaintiff seeks to avoid the Settlement Agreement as a constructive fraudulent transfer. An essential element of that claim under both the Bankruptcy Code and the Texas and Business Commerce Code is that the Debtors did not receive reasonably equivalent value in exchange for the obligation incurred or transfer made.[86]

## A. Reasonably equivalent value generally

Reasonably equivalent value means "the debtor has received value that is substantially comparable to the worth of the transferred property."[87] "There is no set minimum percentage or monetary amount necessary to constitute reasonably equivalent value . . . ."[88] "[T]he debtor need not receive a dollar-for-dollar benefit, but rather a benefit within the range of an arm's-length transaction."[89]

In determining whether reasonably equivalent value was received, the Court may consider an economic benefit flowing from the "debtor's ability to keep his business in operation as a result of his entering into the challenged transaction."[90] "The value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors on the date of the transfer."[91]

---

[86] 11 U.S.C. § 548(a)(1)(B); TEX. BUS. & COM. CODE § 24.005(a)(2).

[87] *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994)); *see also In re 1701 Commerce, LLC*, 511 B.R. 812, 840 (Bankr. N.D. Tex. 2014) (noting that reasonably equivalent value under TUFTA "encompasses a range of values that may include a reasonable percentage above or below a singular, hypothetical 'fair market value'").

[88] *In re Calvillo*, 263 B.R. 214, 220 (W.D. Tex. 2000).

[89] *In re 1701 Commerce, LLC*, 511 B.R. at 840.

[90] *In re Calvillo*, 263 B.R. at 220.

[91] *United States v. Loftis*, 3:06-CV-1633-P, 2009 WL 10678612, at *6 (N.D. Tex. Mar. 5, 2009) (internal quotation marks omitted), *aff'd*, 607 F.3d 173 (5th Cir. 2010); *see also In re 1701 Commerce, LLC*, 511 B.R. at 840 ("A creditor's concern after a transfer of secured assets is whether the estate was diminished."); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) ("The purpose of [fraudulent transfer] laws is estate

## B. Reasonably equivalent value in the settlement context

Because courts—in the nonsettlement context—generally look to see if what the debtor received was "in the range of a reasonable measure of the value of what the debtor transferred,"[92] determining reasonably equivalent value in the settlement context appears substantially similar to, if not exactly the same as, determining whether to approve a proposed compromise during a bankruptcy. A proposed compromise and settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness.[93]

Two other legal precepts from bankruptcy settlements appear equally applicable in reviewing a prebankruptcy settlement. First, to determine whether a settlement is fair and equitable, this Court should consider and evaluate the following factors: (i) the probability of success in the litigation, with due consideration for uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (iii) all other factors bearing on the wisdom of the compromise.[94]

Second, while a court must evaluate all factors relevant to a fair and full assessment of the wisdom of the proposed compromise,[95] a court need not conduct a "mini-trial" of the merits of the claims being settled.[96] "[T]he bankruptcy judge does not have to decide the numerous questions

---

preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors.").

[92] *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 172 (S.D. Tex. 2009).

[93] *In re Mirant Corp.*, 348 B.R. 725, 743 (Bankr. N.D. Tex. 2006); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

[94] *See In re Cajun Electric Power Coop.*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted).

[95] *Id.* at 356.

[96] *Id.*

of law and fact.... The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness."[97]

Finally, "in the context of a fraudulent transfer action seeking to set aside a settlement, the Court finds that it is appropriate to take into account the strong public policy favoring settlement agreements."[98] There is value in the resolution of disputed claims.[99]

## C. Review of reasonably equivalent value in connection with the Settlement Agreement

The Plaintiff alleges that Victory received reasonably equivalent value in exchange for the Settlement Agreement in three principal forms: (1) the in-network agreements entered into with Cigna; (2) the reprocessing of Victory's claims under the Settlement Agreement, which resulted in the payment of more than $3.3 million to Victory; and (3) mutual releases, including a release from Cigna as to Cigna's claims to recover amounts that had been previously paid to Victory. Each is discussed below.

### 1. In-network agreements entered into with Cigna

Cigna first points to the benefits Victory received by going in-network with Cigna, including expected significant volume in growth as well as benefit-reimbursement certainty. Although the in-network agreements did not become effective until April 1, 2015, Mr. Helms signed the in-network agreements for Victory on February 24, 2015. Nothing in the summary-judgment record suggests that the parties' entry into the in-network agreements was contingent

---

[97] *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y.1994); *In re Mirant Corp.*, 348 B.R. at 743.

[98] *In re Xtra Petroleum Transp., Inc.*, No. 11-12639-J11, 2012 WL 1207406, at *6 (Bankr. D.N.M. Apr. 11, 2012); *see also, e.g., Matter of Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996) ("[P]ublic policy strongly favors pretrial settlement in all types of litigation because such cases, depending on their complexity, 'can occupy a court's docket for years on end, depleting the resources of parties and the taxpayers while rendering meaningful relief increasingly elusive.'" (quoting *U.S. Oil & Gas v. Wolfson*, 967 F.2d 489, 493 (11th Cir.1992)).

[99] *In re Hefner*, 262 B.R. 61, 65 (Bankr. M.D. Pa. 2001) ("I find that the release of claims against a debtor can be considered 'reasonably equivalent value' under the dictates of § 548(A)(2)(a)."); *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 389 (Bankr. E.D. Pa. 1988) ("There is no question that the compromise of a dispute can supply the element of consideration in a contract.").

upon entry into the Settlement Agreement. Because Victory earned its rights and benefits under the in-network agreements—at least for business going forward—before entering into the Settlement Agreement, they were not legally part of the consideration for the Settlement Agreement and cannot be included in the reasonably-equivalent-value determination.

### 2. *Reprocessing of Victory's claims under the Settlement Agreement*

Cigna next points to the reprocessing of the Exhibit A Claims under the Settlement Agreement, which resulted in the in-network-rate payment of more than $3.3 million to Victory. Victory, on the other hand, relies on the expert report of Cynthia Seale, who assumed an out-of-network-rate and opined as follows:

> After reviewing the underlying information in this matter, it is my opinion that the Victory North Facilities did not receive a reasonably equivalent value in the Settlement Agreement. I conclude that the total value of the Cigna Settlement Claims is $10,994,843, based on the historical average amounts Cigna had allowed and paid for these types of claims. I removed patient responsibility of $1,154,698 and Cigna insurance payments of $3,376,535 to determine the Victory North Facilities' unrealized value of $6,474,049 on these claims . . . .[100]

Ms. Seale noted Cigna's fee-forgiveness investigation in her report, but did not (and could not, as a nurse and CPA) take into consideration the legal risk to Victory of the fee-forgiveness issue. Instead, Ms. Seale made this assumption:

> My understanding of Cigna's utilization of the SIU is that they applied a wholesale approach to these claims and did not process or pay them. My approach was to value these claims based on historical amounts, namely the allowable amounts determined by Cigna for claims not placed into Cigna's SIU. I conclude that this is an appropriate way to determine the claims' values based on Cigna's failure to process them.[101]

---

[100] Adv. ECF No. 117-1, at 37 of 60. Cigna retained a rebuttal expert, Phil Hurd, who criticized Ms. Seale's expert opinion but did not offer his own estimate of the value of Victory's pre-release claims. Adv. ECF No. 117-2, at 59-60 of 60, through Adv. ECF No. 117-3, at 1-16 of 60. Cigna does not rely on Mr. Hurd's expert report in support of its request for summary judgment.

[101] Adv. ECF No. 117-1, at 37 of 60.

The Court assumes—for purposes of the competing requests for summary judgment—that Ms. Seale's *nonlegal* analysis and calculations are correct regarding the pre-release, out-of-network value of the Exhibit A Claims. The Court agrees with Cigna, however, that the $3.3 million "post-release value" of the Exhibit A Claims, coupled with Victory's avoidance of a significant fee-forgiveness legal risk (that could potentially result in *zero* payments to Victory), make the Settlement Agreement fall well within the range of reasonableness.

The following legal and factual issues and sub-issues (among others) are hotly contested by the parties, and were all put to rest by the Settlement Agreement after litigation and negotiation between sophisticated parties with counsel:

- Whether Victory was engaged in fee-forgiveness.

- Whether Cigna used the fee-forgiveness investigation as a pretext to push Victory to go in-network with Cigna.

- Whether Cigna accurately and timely determined covered charges so that Victory could calculate the patient's out-of-pocket responsibility and reasonably bill the patient.

- Whether the surveys Cigna sent to patients during its investigation were vague and whether patient responses were reliable.

- Whether Cigna conducted a fair-minded investigation to look for documentary evidence of fee forgiveness.

- Whether a court should use a *de novo* standard of review or an abuse-of-discretion standard of review when determining if Cigna properly denied the forty-four claims submitted under fully insured plans.

- Whether Cigna's construction of the plans' exclusionary language was legally incorrect.

- Even if Cigna's construction of the plans' exclusionary language was legally incorrect, whether Cigna's interpretation still fell within its discretion.

- Whether Cigna's sweeping response to Victory's charges was based on substantial evidence.

- Whether the facts of the underlying dispute are similar to, or distinguishable from, the facts in *Connecticut General Life Insurance Company v. Humble Surgical Hospital*,[102] where the Fifth Circuit upheld Cigna's fee-forgiveness determination that Cigna made after an investigation that involved reviewing patient survey responses.

The Court need not conduct a trial to determine all of these legal and factual issues. Instead, the Court has canvassed the issues and is satisfied that the Settlement Agreement allowed Victory to avoid risky (and potentially lengthy and costly) litigation and to obtain a relatively quick infusion of $3.3 million of cash to save its business. The Court is convinced that the settlement was well within the range of reasonableness. Victory received reasonably equivalent value under the Settlement Agreement.[103]

---

[102] 878 F.3d 478 (5th Cir. 2017).

[103] *See, e.g., In re Xtra Petroleum Transp., Inc.*, No. 11-12639-J11, 2012 WL 1207406, at *8-9 (Bankr. D.N.M. Apr. 11, 2012) (debtor received reasonably equivalent value under prepetition settlement, negotiated by counsel, under which debtor agreed to pay creditor $610,000; benefits to debtor included (a) avoiding additional legal fees; (b) avoiding the risk of an adverse judgment resulting from a jury trial; (c) obtaining a release of alter ego claims against it; (d) obtaining creditor's forbearance from exercising remedies against debtor so long as debtor made promised payments, thereby giving debtor the opportunity to turn the company around and avoid either liquidation or bankruptcy; and (e) obtaining additional delay in the event the creditor exercised remedies upon a default under the

### 3. *Mutual releases, including a release from Cigna as to Cigna's claims to recover amounts that had been previously paid to Victory*

Victory's evidence indicates that the amount previously paid to Victory on the Exhibit A Claims was only in the $7-8,000 range.[104] Cigna disputed this figure at the hearing but could point to no other evidence in the record of the amount of such payments. Therefore, the value to Victory of Cigna's release of its right to claw back these payments is not material. The release that had much greater value to Victory was Cigna's release and settlement of its asserted right to refuse payment based on alleged fee-forgiveness by Victory. The Court already addressed this value.

## D. Can the Court make the reasonably-equivalent-value determination at this summary-judgment stage?

There are cases where the material subsidiary facts about the value given and received in a prebankruptcy settlement are disputed so that the court cannot make a reasonably-equivalent-value finding at the summary-judgment stage.[105] Under the unique circumstances of this case, however, the Court can make that determination now.[106] The Court has assumed at this summary-judgment stage that the "pre-release" value of Victory's claims—without considering litigation risks—is the value placed on them by Victory's expert: $10,994,843, less patient responsibility of $1,154,698,

---

settlement agreement); *In re Jordan*, 392 B.R. 428 (Bankr. D. Idaho 2008) (Chapter 11 debtors received reasonably equivalent value under prepetition settlement agreement that resolved potentially lengthy, expensive, and risky litigation and that permitted debtor to deal with entirety of underlying real property without litigation threat by the prior owner, who released specific performance and breach of contract claims asserted under his earlier executed purchase agreements).

[104] *See* Declaration of Kelly Russell, found at Adv. ECF No. 133 (pages 247-50 of 311 of PDF file), marked as "Exhibit 32" (3TA761-3TA764).

[105] *See, e.g., In re Taylor*, 228 B.R. 491, 501–02 (Bankr. M.D. Ga. 1998) (defendant argued that court could make reasonably-equivalent-value determination at the summary-judgment stage because the prepetition stock transfer occurred in connection with a settlement agreement and the court need only find that the settlement was in the range of a reasonable measure of the value of the stock; court rejected the argument, finding that there were material disputed facts about (a) the value of the stock transferred by the debtor to the defendant, and (b) the value to the debtor of being released from personal guarantees on corporate debts).

[106] *Cf. In re Worldwide Diamond Ventures, LP*, 559 B.R. 143, 150-51 (Bankr. N.D. Tex. 2016) (granting summary judgment on constructive fraudulent transfer claim when there were no material disputed subsidiary facts regarding the value paid and received in connection with the debtor's prepetition diamond purchase).

for a total of $9,840,145. That value can only go down at trial when the Court would consider Cigna's rebuttal expert. The parties and the Court already know that Victory received $3.3 million under the in-network-agreement rates that were applied to the Exhibit A Claims under the Settlement Agreement. The parties have fully briefed and argued the factual and legal issues that were resolved by the Settlement Agreement. At a trial, the Court would not actually resolve the underlying merits of the disputes that were settled; the Court instead would canvass the issues just as it has already done for this Order. The parties would argue at trial—just as they have here— whether the avoidance of litigation risk to Victory, coupled with the $3.3 million, was reasonably equivalent value. Would a trial add anything to this process? No. The Court would reach the same conclusion: Victory received reasonably equivalent value under the Settlement Agreement.

### E. What about Victory's request for partial summary judgment as to the forty-four claims submitted under fully insured plans?

As noted above, with respect to the forty-four claims submitted under fully insured plans, Victory asks for partial summary judgment that (i) Cigna improperly denied the claims; (ii) such claims had a pre-release, out-of-network value of $1,639,211.19 in the aggregate; (iii) Cigna's post-release payments on such claims (based on an in-network valuation) were $658,997.32 in the aggregate; and (iv) the post-release payment on any such claim was not reasonably equivalent to its pre-release value. The Court rejects Victory's request for two reasons.

First, the Court is not trying the merits the underlying disputes that were settled under the Settlement Agreement, including whether Cigna improperly denied the forty-four claims. Instead, the Court is reviewing the consideration given and received by Victory under the Settlement Agreement to determine whether Victory received reasonably equivalent value. As noted above, part of the consideration Victory received was avoiding significant litigation risks on fee-

forgiveness. The Court has canvassed that issue and all other relevant issues in the reasonably-equivalent-value determination.

Second, the Court need not determine whether there were 317 individual fraudulent transfers when the Exhibit A Claims were settled, or even whether there were two fraudulent transfers: one for the forty-four claims submitted pursuant to fully insured plans, and one for the 273 claims that were submitted pursuant to self-funded plans. There was a single Settlement Agreement that Victory seeks to unwind. That single Settlement Agreement resolved *all* of the parties' disputes in one package deal. The Court has reviewed that package deal and determined that Victory received reasonably equivalent value in the exchange.[107]

## V.     OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

The Court overrules all parties' objections to summary judgment evidence, including the *Defendants' Objections to Plaintiff's Summary Judgment Evidence*,[108] unless specifically sustained in this Order. In addition, the Court grants the *Trustee's Motion[s] for Opportunity to Properly Support Facts Pursuant to Fed. R. Civ. P. 56(e)(1)*.[109]

## VI.     CONCLUSION

For all the reasons detailed above, Cigna is entitled to summary judgment that Victory received reasonably equivalent value under the Settlement Agreement. In light of the Court's ruling, the Court need not consider Cigna's other arguments in support of its request for summary judgment. The Court denies the Plaintiff's Summary-Judgment Motion because the reasonably-

---

[107] Even if the Court were to conduct two or even 317 mini-evaluations on reasonably equivalent value, the Court's conclusion would be the same: that Victory received reasonably equivalent value when considering all of the relevant factors.

[108] Adv. ECF No. 128.

[109] Adv. ECF Nos. 134, 136.

equivalent-value issue (an essential element of its constructive fraudulent-transfer claims) has been determined against the Plaintiff, rendering the balance of the Plaintiff's arguments moot.

Therefore, the Court hereby **ORDERS AS FOLLOWS:**

1. Cigna's Summary-Judgment Motion [Adv. ECF No. 120] is **GRANTED** in part as set forth above.

2. Victory's Summary-Judgment Motion [Adv. ECF No. 116] is **DENIED**.

3. The Defendants' Objections to Plaintiff's Summary Judgment Evidence [Adv. ECF No. 128] are **OVERRULED.**

4. The Trustee's Motions for Opportunity to Properly Support Facts Pursuant to Fed. R. Civ. P. 56(e)(1) [Adv. ECF Nos. 134, 136] are **GRANTED**.

**### END OF ORDER ###**
